## Hallman v. Montgomery County.

*Constitutional law—Title of statute—Constitution, art. iii, sect. 3—Public officers—Sheriff's solicitors—Salary—Payment by county—Act of May 10, 1923.*

1. An act should not be declared unconstitutional by reason of defective title, unless a substantive matter entirely disconnected with the legislation sought to be enacted is included within the bill.

2. While the title of an act need not be a complete index of the details of the act, it should be sufficient to cover details of the general subject.

3. The Act of May 10, 1923, P. L. 183, entitled "An act authorizing sheriffs in counties of the fourth class to appoint a solicitor, prescribing the duties of said solicitor and fixing his salary," does not violate article iii, section 3, of the Constitution, relating to titles of acts.

4. The title of the Act of 1923 is sufficient to give notice that the sheriff's solicitor "shall receive a salary of five hundred dollars per annum, to be paid out of the county treasury."

*Assumpsit.* Trial without jury. C. P. Montgomery Co., Nov. T., 1924, No. 147.

*Evans, High, Dettra & Swartz,* for plaintiff; *Freas Styer,* for defendant.

WILLIAMS, J., Aug. 27, 1924.—After hearing the evidence and listening to the arguments of counsel, we make the following

### Findings of fact.

1. The plaintiff is a person learned in the law.

2. The defendant, containing over a hundred and fifty thousand inhabitants, is a county of the fourth class.

3. On the 11th day of May, 1923, the sheriff of the defendant appointed the plaintiff as his solicitor.

4. The term for which the sheriff was elected ended on the first Monday, being the 7th day of January, 1924.

5. The plaintiff held office from the said 11th day of May, 1923, until the said 7th day of January, 1924, or for 79/120ths of a year.

6. The Act of May 10, 1923, § 2, P. L. 183, 184, says that, in all counties of the fourth class, the solicitor of the sheriff shall receive a salary of $500 per annum.

7. Seventy-nine one hundred and twentieths of the said sum of $500 is the sum of $329.11.

8. After the said 7th day of January, 1924, the plaintiff demanded from the defendant payment of the said sum of $329.11.

9. The defendant refused to pay the plaintiff any part of said sum of $329.11, on the ground that the sheriff was a county officer, that the plaintiff was a clerk of the sheriff and that the salary of the sheriff and his clerks, including the plaintiff, exceeded, by the sum of $80.16, the aggregate amount of fees earned during the term of the sheriff and collected by or for him.

10. The plaintiff then brought this action of *assumpsit* against the defendant to recover said $329.11, together with interest thereon from said Jan. 7, 1924.

11. The parties hereto, by agreement filed in the proper office where the suit was pending, having dispensed with trial by jury and submitted the decision of the case to the court having jurisdiction thereof, at the hearing it developed that the aggregate amount of fees earned by the sheriff during his term and collected by or for him had so increased from and after the time of the above demand by the plaintiff as to exceed by the sum of $885.19 the total salaries of the sheriff, all his clerks and the plaintiff.

12. The defendant now refuses to pay the plaintiff any part of said $329.11 because, the former contends, the said Act of May 10, 1923, P. L. 183, entitled "An act authorizing sheriffs in counties of the fourth class to appoint a solicitor, prescribing the duties of said solicitor and fixing his salary" violates that portion of the Constitution of the Commonwealth which declares, in article III, section 3, that no bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title.

## Discussion.

Section 1 of the Act of May 10, 1923, P. L. 183, says that, in all counties of the fourth class, the sheriff may appoint one person learned in the law as his solicitor.  Section 2 provides that said solicitor shall advise upon all legal matters that may be submitted to him and shall conduct any litigation when requested so to do by the sheriff.  The second section provides, also, that the solicitor shall hold office for the term for which the sheriff was elected and shall receive a salary of $500 per annum, to be paid out of the county treasury.

The defendant urges that the title to the said act, although authorizing the sheriffs in counties of the fourth class to appoint a solicitor, prescribing the duties of said solicitor and fixing his salary, gives no notice that the salary of said solicitor is to be paid out of the county treasury, that by said act a new and additional burden is imposed on the taxpayers of the defendant, that, hence, the subject of said act is not clearly expressed in its title and that, therefore, the whole of said act is unconstitutional.

The Constitution of our Commonwealth gives significance and assigns particular importance to the title of an act of assembly and requires that it shall contain but one subject and that such subject shall be clearly expressed in the title: Overseers v. Armstrong County, 11 Pa. Superior Ct. 175, 178 (1899), Orlady, J.

It was said in Road in Phœnixville, 109 Pa. 44, 48, 49 (1885), Sterrett, J., that, while it may be difficult to formulate a rule by which to determine the extent to which the title of an act must specialize its object, it may be safely assumed that the title must not only embrace the subject of proposed legislation, but also express such subject so clearly and fully as to give notice of the legislative purpose to those who may be specially interested therein and, in Quinn v. Cumberland County, 162 Pa. 55, 59 (1894), Green, J., that, while it is probably competent for the legislature to enact a law placing upon a county the duty of paying the expenses incurred by the board of health of a municipality within that county, nevertheless, it is both the duty and constitutional obligation of the members of the legislature to give notice in the title of the enactment of their intention to impose such liability upon the municipal organization to be affected by the statute and, if this duty be neglected, such legislation is contrary to the requirements of the Constitution and, therefore, void.  To these authorities, never questioned, many others of like import could be easily added: Overseers v. Armstrong County, 11 Pa. Superior Ct. 175, 178.

In any event, however, the title is to have a reasonable interpretation.

If the title so fairly gives notice of the subject of the act as reasonably to lead to an inquiry into the body of the bill, it is all that is necessary: Allegheny County Home's Appeal, 77 Pa. 77, 80 (1874) ; State Line & Juniata R. R. Co.'s Appeal, 77 Pa. 429, 431 (1875), Paxson, J.; Fredericks v. Pennsylvania Canal Co., 109 Pa. 50, 55 (1885), Mercur, J.; Washington Borough v. McGeorge, 146 Pa. 248, 254 (1891), Sterrett, J.; Chester v. Bullock, 187

Pa. 544, 550 (1898), McCollum, J.; Com. v. Moore, 2 Pa. Superior Ct. 162, 165 (1896), Orlady, J., and Overseers v. Armstrong County, 11 Pa. Superior Ct. 175, 178.

Over and over again it has been said that it was never intended the title of an act should be an index of the context of the bill. In fact, often it has been declared that the title not only need not, but must not, be a complete index to the contents of the statute.

Where legislation can be fairly reconciled with the Constitution, it is neither the purpose nor the duty of the court to catch at pretexts for the avoidance of such legislation: Mauch Chunk v. McGee, 81 Pa. 433, 438 (1876), Agnew, J.; In re Pottstown Borough, 117 Pa. 538 (1888), Clark, J., and Gas and Water Co. v. Downingtown Borough, 193 Pa. 255, 263 (1899), Green, J.

The title is intended to give only such notice of the legislative intention to affect a right, a power, a remedy, a duty, or a liability, that those who may be specially interested in the subject of the title will, by the wording of the title itself, be clearly invited to examine into the body of the act: Overseers v. Armstrong County, 11 Pa. Superior Ct. 175, 178.

The subject may have but one object while the means necessary for the attainment of that object may necessarily embrace subordinate subjects, differing, it is true, in their nature and particular effect, but all contributing to the main object and comprised within the principal subject. Everything which the character of the subject of a title reasonably suggests as necessary to, or even appropriate for, the accomplishment of the expressed purpose of the title is sufficiently indicated by such title: Sugar Notch Borough, 192 Pa. 349, 353 (1899), Mitchell, J.; Com. v. Jones, 4 Pa. Superior Ct. 362, 370 (1897), Smith, J., and Com. v. Kenney, 32 Pa. Superior Ct. 544, 547 (1907), Orlady, J.

It is not necessary that the title should refer specifically to matters legitimately implied from the purpose of the act as indicated by its title. The essential parts of a statute are the declaratory, the directory, the remedial and the vindicatory. If the title clearly express the subject to which the act is to apply, it is sufficient. The expression in detail, by title, of the character of the several parts of a statute is not required. It is a well recognized principle that, where the subject is expressed in general terms, everything which is necessary to make a complete enactment in regard to the subject, or which results in a complement of the thought contained in the general expression, is embraced in and authorized by the title. While the constitutional provision requires that the subject of the act be clearly expressed in the title, it does not require that the purpose of the act be so expressed: Com. v. Rink (No. 1), 71 Pa. Superior Ct. 579, 581-4 (1919), Williams, J.

The reason for the constitutional clause here invoked is thus expressed by Mr. Justice Sterrett, in Road in Phœnixville, 109 Pa. 44, 48: "The design and scope of this constitutional amendment, adopted in 1864, are readily understood when we consider the mischief which it was intended to remedy. Prior to that date, the vicious practice had obtained of incorporating in one bill a variety of distinct and independent subjects of legislation. The real purpose of the bill was often and sometimes intentionally disguised by a misleading title or covered by the all-comprehensive phrase 'and for other purposes,' with which the title of many 'omnibus' bills concluded. Members of the legislature, as well as the general public, were thus misled or kept in ignorance of the character of the proposed legislation:" Com. v. Rink (No. 1), 71 Pa. Superior Ct. 579, 582.

It is quickly discernible, then, that the actual and fundamental purpose of the constitutional requirement was to reform a legislative practice, which, prior to the original adoption of the inhibition, had grown up, of passing enactments under titles which, because of the generality of the words used, gave not even a hint of the subjects contained in the statutes and so far to correct this unfortunate practice that thereafter the title should be so indicative of the subject as to lead to inquiry and not to ensnare and entrap: Com. v. Green, 58 Pa. 226 (1868), Sharswood, J.; Jewell's Estate, 235 Pa. 119 (1912), Moschzisker, J.; Leinback's Estate, 241 Pa. 32 (1913), Stewart, J., and Com. v. Thomas, 248 Pa. 256 (1915), Brown, C. J.

Since the evident purpose in placing the restriction in the Constitution was to prevent fraud or deception, a court should not strike down an act of assembly when, although the matter of which complaint is made may have the appearance of coming within the literal words of the Constitution, it is not, in reality, within the evil prohibited. In other words, an act should not be declared in violation of the Constitution by reason of the title of the bill offending section 3 of article III, unless a substantive matter, entirely disconnected with the legislation sought to be enacted, is included within the bill: Carr v. Ætna A. and Liability Co., 64 Pa. Superior Ct. 343 (1916), Kephart, J.

From the foregoing it is at once apparent that it was not the intention of the framers of the constitutional clause that their prohibition should obstruct the proper progress of the law, but that, on the contrary, their desire was to prevent an evil which is far from discoverable in the act at bar.

Many acts have been declared unconstitutional on the ground of defective title, but no case cited by counsel for the defendant, when applied to the act under consideration, is of compelling force.

It is true, as pressed by the learned solicitor for the county commissioners, that the Special Act of March 18, 1868, P. L. 352, which was entitled "An act relating to boroughs of the County of Chester" and repealed certain provisions of a general act entitled "An act regulating boroughs," respecting the proceedings for laying out and opening roads within the boroughs of Chester County, the effect of which was to relieve the property owners in the boroughs of paying damages for roads opened within the boroughs and to shift that burden upon the county, was held unconstitutional because the title did not clearly express the purpose of the act: Road in Phœnixville, 109 Pa. 44; that the Act of June 6, 1893, P. L. 328, entitled "An act providing for the relief of needy, sick, injured and, in case of death, burial of indigent persons whose legal place of settlement is unknown," was held defective in title and repugnant to section 3, article III, of the Constitution: Decatur Township Poor District v. Clearfield County, 16 Pa. C. C. Reps. 554 (1895), Gordon, P. J. (Clearfield); that the Act of July 9, 1897, P. L. 233, entitled "An act for the destruction of wild cats, foxes and minks in this Commonwealth and providing for the payment of bounties on the same, officers' fees and fixing of penalty for violation of same," was held defective in title, inasmuch as the title did not show that the counties were to pay for the bounties: Teeple v. Wayne County, 23 Pa. C. C. Reps. 361 (1900), Purdy, J. (Wayne); that the Act of May 5, 1899, P. L. 231, entitled "An act authorizing counties of the Commonwealth of Pennsylvania to purchase, maintain, use and condemn bridges erected and in use over rivers and streams separating or dividing any part or district of such counties," etc., was held unconstitutional because its title failed to disclose that important powers and duties were taken away from constitutional officers, such as county commissioners, and vested in the grand jury: Stegmaier v. Jones, 203 Pa. 47 (1902), Mitchell, J.; and that it

Hallman v. Montgomery County.

was held that the title to the Act of June 12, 1913, P. L. 502, relating to the payment of certain sums to the families of persons imprisoned at hard labor, did not disclose the legislative purpose to impose upon the counties liability for payment to the families of such persons and that, hence, so much of the act as provided that when funds of the institutions where such persons were confined were insufficient for such payments, they should be charged to and paid for by the county from which the defendant had been committed, violated article III, section 3, of the Constitution of Pennsylvania and was, therefore, void: Fedorowicz v. Brobst, 254 Pa. 338 (1916), Brown, C. J.

All the authorities relied on by counsel for the defendant are, however, plainly distinguishable from the case at bar. For instance, in the Phœnixville Road case, the act undoubtedly offended against the second clause of the constitutional provision, in that the subject of legislation was not expressed in the title with sufficient clearness to give any notice at all of the legislative purpose, which, as has been seen, was to transfer the burden of street damages in the several boroughs of the county from the benefited property owners therein and impose the same on taxpayers of the county at large. No one reading the title of the act would, for a moment, have supposed that such was the legislative intention; on the contrary, he would, without hesitation, have concluded that the operation of the act was restricted to boroughs and that no property owners in the county outside the boroughs could be thereby affected. Furthermore, the title not only failed to give notice of the legislative purpose, but it was actually misleading.

In the Clearfield County case, by the title of the act, the only purpose disclosed was relief and the only notice given was to the persons who were to receive such relief, who were to become the objects of the bounty of the bill, a limited class, consisting only of those needy, sick, injured and dead persons whose legal settlements were unknown. But the bill itself had a much wider scope. First, it extended to *all* needy indigent persons, regardless of their place of legal settlement. Second, it made poor districts liable for such relief. Third, it provided that relief furnished by poor districts to those whose legal settlements were unknown should be borne by the county in which the poor district furnishing such relief was located and, in the event of such poor district having assumed, or paid, the expenses incurred in such relief, the county should be liable in an action of *assumpsit* and that the want of an order of relief, or approval order, should not be a bar to recovery. Thus, the bill made radical changes in the law then existing. Prior to the passage thereof, the sources of revenue by taxation for poor and county purposes had been different; the same kinds of property had not been taxable for each purpose. By removing certain burdens from the poor districts and placing them upon the county, the bill affected the liability of the taxpayer and his property to taxation. The county was made liable to the poor district for relief furnished without any order of relief, even though the district might not have paid the relief, but only assumed to pay it. The bill did not require any notice to the county that relief was being, or would be, furnished, or that the county would be called upon to pay the relief. The county was given no voice, or say, in the furnishing of relief, or in determining whether the indigent person was a proper subject of bounty, or the kind, or amount, of assistance he should have. The title was silent as to how and by whom the relief should be furnished. It gave no notice of any change in the law affecting counties to any county official. Although it materially affected his rights and increased his liabilities, it furnished him with no information which would put him upon inquiry as to the contents of the bill.

Hallman v. Montgomery County.

In connection with this cited authority, it is interesting to note that which, presumptively, the diligence of counsel for the defendant failed to discover, namely, that, while no appeal was taken by Clearfield County from the judgment entered by President Judge Gordon, or by Luzerne County from a similar order made some two months earlier by President Judge Craig, of the 43rd judicial district, specially presiding (Conyngham Township v. Luzerne County, 5 Dist. R. 183 (1895), eventually the County of Armstrong did appeal from a like decree and on such appeal the lower court was reversed and it was held that the title to the Act of June 6, 1893, P. L. 328, so fairly gave notice of the provisions of the statute as reasonably to lead to an inquiry into the bill and that, hence, the act was constitutional: Overseers v. Armstrong County, 11 Pa. Superior Ct. 175.

In the Wayne County case, the body of the act provided for the payment of a bounty for each of the noxious animals killed. The bounty was to be paid through an order drawn on the county treasurer by the county commissioners upon production of the certificate of a justice of the peace showing compliance with the provisions of the act and that the holder was entitled to receive the bounty. The act provided, also, for payment by the county treasurer, in each case, of a fee to the magistrate. The President Judge of the 22nd judicial district did, indeed, hold this freak statute unconstitutional because it gave no notice whether the bounties and fees of the justices were to be paid by the State, the county, some municipal division in the county, or from what source the financial rewards of hunters and trappers and the emoluments of their official backers were to arise, but an analysis of the opinion of the court, the title of the act and the facts of the case reveals that it was entirely unnecessary and superfluous for Judge Purdy so to do, for, in point of law, the right of the relator to the order sought rested upon the provisions of the Act of April 11, 1899, P. L. 43, entitled only "An act to amend the title to" the Act of July 9, 1897, P. L. 233. It must be obvious that the amendatory statute was a clear constitutional infringement of article III, section 6, which, in part, says that no law shall be amended by reference to its title only; so that, whether the main stock, lacking sufficient vigor for the purpose of the relator, was or was not dead from constitutional blight, the legislature selected an unconstitutional method of engrafting it with new life. Moreover, this decision is not, necessarily, of binding weight upon us; more especially if, upon the facts of the case, the opinion be not based upon the soundest reasoning and the most correct legal principles.

In Stegmaier v. Jones, 203 Pa. 47, there was a serious and insuperable objection to the act, in that, although the body of the act was replete with a departure, almost revolutionary, from the settled policy of the State on the administration of the affairs of the counties, not only was such purpose not clearly expressed, but no indication whatsoever of it was given in the title. From the earliest days of the province, county affairs, particularly their financial matters, had been administered by county commissioners; for more than a century, the duties and powers of the commissioners had not been materially changed; and, long before 1885, commissioners had become constitutional officers. From the title of the act, taxpayers, as well as the officers affected, might well have supposed that the authority intended to be granted was to be exercised by the usual, natural, duly constituted officers for that purpose. But the body of the act put the final authority upon the grand jury. The most important feature in the act, therefore, the power to impose on the county heavy and serious burdens of debt, was thus, without any notice in the title, transferred to a shifting and uncertain body, not usually, if ever,

exercising such powers, not elected by the voters, but drawn by lot and not requiring even the supervision of the court, yet vested by the act with authority to overrule, without appeal, the constitutional officers chosen by the electors to administer the particular class of affairs with which the body of the bill sought to deal.

In Fedorowicz v. Brobst, 254 Pa. 338, upon which, apparently, the defendant places chief reliance, the act was entitled "An act to increase the powers of courts in summary proceedings for desertion or non-support of wives, children or aged parents, by directing that imprisonment in such cases be at hard labor in such institution as the court shall name, with the wages payable to the wives, children or parents; providing for the disbursement of moneys collected on forfeiture of bonds, bail bonds or recognizances, and by empowering such courts to appoint desertion probation officers for the performance of such duties as the court shall direct, and providing for the payment of the expenses incident to the carrying out of this act." In this title there was not to be found even a hint that a burden theretofore not borne by counties was to be placed upon them. A fair inference to be drawn from the title was that husbands, imprisoned for failure to support their wives and children, would have to perform hard labor during their imprisonment, for which performance wages were to be paid to dependent families of the prisoner; but in no one of the five sections of the body of the bill did the word "wages" ever appear. The 2nd section of the act merely provided that whenever, under the provisions of the act, any defendant should be ordered to be imprisoned at hard labor, there should be paid, by the officer in charge of the penal or reformatory institution in which he was imprisoned, to the person designated in the order of the court as the proper recipient of such money the sum of 65 cents for each day, Sundays and legal holidays excepted, during which he remained in prison and, if such sum should not be paid by the penal institution, then it was to be charged to and paid by the county from which the defendant had been committed. No one who read the title to this act would have conjectured that it contained a provision requiring a county to pay a stipulated sum for the support of the family of a delinquent husband for each day of his imprisonment. If the penal institution to which he had been committed failed to pay this sum, his sentence to imprisonment at hard labor, *ipso facto,* made the county liable to pay it. This was a new and radical departure from all previous legislation relating to prosecutions for non-support of wives, children or parents. Of it the most cautious man would have found no notice in the title of the act.

With due regard to the State-wide nature of the question here presented and out of deference to the seeming earnestness of counsel for the county commissioners, the writer hereof has carefully read and reread all the decisions cited in the brief submitted on behalf of the defendant. With what was decided in any of those cases, the view here taken is not necessarily in conflict, although, it may be, in one or more of them, there are to be encountered scattered expressions indicating at least partial uncertainty of, if not slight variation in, opinion among the respective authors. This, however, does not occasion surprise, for it is to be borne in mind that the Constitution of 1874 was a new departure in the history of the law, that, instead of being confined, in accordance with the traditions of American institutions, to the framework of the government as composed of general and fundamental principles, it was converted into a binding code of particulars and details which previously had been left to the province of ordinary legislation and that the underlying motive prompting the framing of the present constitutional provisions was a

profound distrust of the legislature. As pointed out by Mr. Justice Dean, in Perkins et al. v. Philadelphia, 156 Pa. 554, 565 (1893), article III contains sixty specific prohibitions of legislation, in addition to many restrictions and regulations not absolutely prohibitory. Through these the pathway for honest, desirable and necessary laws is not always clear and, hence, it is inevitable that in the views of judges forced to enter a field unusually difficult and oft untrodden, divergence is sometimes found: Com. v. Gilligan, 195 Pa. 504, 512 (1900), Mitchell, J.

Undoubtedly, many acts have been passed, the framers of which intended to evade constitutional provisions. These statutes the courts have always unhesitatingly felled and may be safely relied upon to continue so to do. But where the legislative intent is not to evade their restrictions, as hitherto observed, the courts are not required to be astute in extending them over cases not really within the evil prohibited, although the form does have the appearance of coming within the literal words of the Constitution. It may, therefore, be taken as settled law that, in cases of this character, the courts will look beyond the mere form of the act and, in the light of the purpose of constitutional restriction, examine the true intent and effect of the statute: Com. v. Gilligan, 195 Pa. 504, 513-14.

As expressed in the title, the subject-matter of the act in question is the authorization of sheriffs in counties of the fourth class to appoint a solicitor, the prescription of the duties of the latter and the fixation of his salary. By whom the fixed salary is to be paid is not, it is true, specified in the title. But it is a fair assumption that the members of the legislature did not expect a person learned in the law, without compensation, to advise a sheriff upon all legal matters that the latter might see fit to submit to the former and to conduct any litigation when requested so to do by the sheriff. Doubtless, they felt that the ox who was to tread out the corn was entitled, at least, to his provender, believed that the laborer is worthy of his hire and possessed enough imagination to foresee that even a member of a too much and unjustly abused profession might have not only office expenses to defray, but a wife and little ones tugging at his coat-tails for food, shelter and raiment. Were it not so, why did the legislature fix a salary for the solicitor?

The title relates to a broad, definite and fixed class of persons, i. e., all sheriffs in all fourth class counties—of which the defendant is one—and provides that any such sheriff may appoint as his solicitor one person learned in the law. Thus, the very words used in the title in and of themselves invite the defendant to a critical examination into the provisions of the statute: Com. v. Curry, 4 Pa. Superior Ct. 356, 361-62 (1897), Orlady, J., and Overseers v. Armstrong County, 11 Pa. Superior Ct. 175, 178.

The sheriff is a constitutional county officer: Article XIV, section 1. It would naturally be supposed that, like his own salary, the salary of his solicitor should, logically, be paid out of the county treasury. Independently of this, however, it cannot be gainsaid that the legislature had the power to impose upon the defendant liability for the service rendered by the plaintiff. Therefore, the defendant, as a municipal organization, not only could, but in all probability would, be specially affected and interested by such legislation and, having both actual present interest and possible future liability therein, was plainly and clearly beckoned by the title into a further and exhaustive perusal of the act: Com. v. Lloyd, 2 Pa. Superior Ct. 6 (1896), Willard, J., holding that the Act of March 16, 1872, P. L. 405, entitled "An act relating to the County Commissioners of Cambria County," in respect to its title, was all-sufficient to give notice of any legislation properly pertaining to the rights,

duties and powers of the commissioners; that there was nothing in the body of the act which did not pertain to such rights, duties and powers; that, instead of being misleading, the title was germane to every subject mentioned in the body of the bill; that the entire statute pertained to but one subject and that it followed, therefore, that the act did not violate article III, section 3, and declaring that, in the construction of statutes alleged to offend against the Constitution, from the decisions the following, among others, propositions have become legal maxims in Pennsylvania: First, nothing but a clear usurpation of a power prohibited will justify pronouncing an act of the legislature unconstitutional; second, the title of an act is part of the act and a guide to its right construction; and, third, the effect, not the purpose, of an act determines its validity.

Not only does the title of the Act of May 10, 1923, P. L. 183, necessarily imply that the expense of the payment of salary therein mentioned as being fixed would be incurred in the authorization of the sheriff to appoint such a solicitor and was every county which could be made liable by a legislative enactment for such payment bound to look into the terms of the statute: Sugar Notch Borough, 192 Pa. 349, 353, and Overseers v. Armstrong County, 11 Pa. Superior Ct. 175, 179; but the *piece de resistance* of the argument of counsel for the defendant, that to pay the salary of the solicitor of a constitutional county officer out of the county treasury would be a new and radical departure from all previous legislation, is by no means all-convincing.

The Act of March 28, 1907, P. L. 37-38, by its title described itself as authorizing and empowering county controllers, in counties containing a population of from 300,000 to 1,000,000, to designate and appoint a solicitor, prescribing the duties of said solicitor and fixing his term of appointment and salary. Section 1 went further than the title and enacted that the salary of the solicitor was to be paid out of the county treasury. The Act of June 8, 1911, P. L. 704, amended the 1st section of the Act of March 28, 1907, P. L. 37, so as to make it apply to all counties containing a population of not less than 800,000 nor more than 1,400,000, and the Act of March 22, 1917, P. L. 9-10, further amended section 1 of the said Act of 1907.

The Act of July 18, 1917, P. L. 1042-43, was entitled "An act authorizing county controllers, in counties having a population of not more than 100,000 and less than 150,000 inhabitants, to appoint a solicitor; prescribing the duties of said solicitor and fixing his salary." The body of the bill said that the salary of such solicitor was to be paid out of the county treasury. By the Amendatory Act of April 4, 1919, P. L. 37, the provisions of the Act of July 18, 1917, P. L. 1042, were so extended as to include the defendant. In the more than five years since intervening, so far as we are advised, the right of the solicitor of the controller to receive his salary from the county treasurer has never once been questioned by the defendant. Yet, if, by reason of a defective title, the Act of May 10, 1923, P. L. 183, is unconstitutional, so, also, by the same token, surely are the Act of July 18, 1917, P. L. 1042, and its amendment of 1919.

Besides, if, at any time within the last seventeen years, any county in the State has ever objected to the payment out of the county treasury of the salary of the solicitor to the controller because of the alleged unconstitutionality of any of the said Acts of March 28, 1907, June 8, 1911, March 22 and July 18, 1917, and April 4, 1919, counsel for the defendant has not directed our attention to a single case so showing. In the face of this lengthy contemporaneous construction on the part of so many counties of the Commonwealth of a statute on all-fours, as to title and body, with the one under

discussion, the court naturally hesitates to strike down the Act of May 10, 1923, P. L. 183, when so to do would be, in effect, to pronounce such long-continued construction erroneous and, by inevitable logical sequence, for an identical reason, to invalidate an act or acts standing for a long period on the statute books. When a bill has been in operation for a long time without objection on the ground of alleged unconstitutionality, courts shrink even more than ordinarily from favorably countenancing such belated adverse argument: Com. ex rel. Wolfe v. Butler, 99 Pa. 535 (1882), Sharswood, C. J.; Sugar Notch Borough, 192 Pa. 349; Com. v. Gilligan, 195 Pa. 504; Kucker v. Sunlight Oil and G. Co., 230 Pa. 528 (1911), Moschzisker, J.; Kennedy Township Road, 50 Pa. Superior Ct. 619 (1918), Rice, P. J., and Maginnis v. Schlottman, 76 Pa. Superior Ct. 124, 127 (1921), Trexler, J.

From all the facts found and partially for the reasons suggested in the foregoing discussion there are drawn the following

### Conclusions of law.

1. The subject of the Act of May 10, 1923, P. L. 183, is clearly expressed in the title.

2. The said act, therefore, does not violate article III, section 3, of the Constitution of the Commonwealth of Pennsylvania.

3. Said act is not unconstitutional.

4. The plaintiff is entitled to recover.

5. Judgment should be entered in favor of the plaintiff and against the defendant for the sum of $329.11, together with interest thereon from Jan. 7, 1924.

And now, Aug. 27, 1924, it is ordered and directed that this decision be filed in the office of the prothonotary, that notice thereof shall be forthwith given by him to the parties or their attorneys and that if, within thirty days after service of such notice, no exception to said decision be filed in the said office, judgment thereon shall be entered by the said prothonotary.

From Aaron S. Swartz, Jr., Norristown, Pa.